# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JEFF L. KEAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00885** |
| | ) | **Judge Aleta A. Trauger** |
| **BRINKER INTERNATIONAL, INC.** | ) | |
| **d/b/a CHILI'S GRILL & BAR,** | ) | |
| **BRINKER INTERNATIONAL** | ) | |
| **PAYROLL CO., L.P. d/b/a CHILI'S** | ) | |
| **GRILL & BAR, and CHILI'S, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff Jeff L. Kean pursues this action against his former employers,[1] alleging that he was terminated in 2018 because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"). Now before the court are two Motions for Summary Judgment—one filed by the plaintiff (Doc. No. 39) and one by the defendants (Doc. No. 42)—as well as the plaintiff's Motion for Sanctions and/or to Exclude Evidence (Doc. No. 33).

Because the relief sought in connection with the Motion for Sanctions may impact the evidence the court may consider in support of the summary judgment motions, the court will first

---

[1] The plaintiff has sued Brinker International, Inc., Brinker International Payroll Co., L.P., and Chili's Inc. (*See* Doc. No. 1.) The defendants maintain that Brinker International Payroll Co., L.P. is the only properly named defendant, but they have not moved for the dismissal of any of the other defendants, nor have they presented actual proof, as opposed to lawyer argument, to support that position. (*See, e.g.*, Answer, Doc. No. 11, at 1 n.1; Doc. No. 44-3, Kissel Dep. 13 (lawyer's statement affirming that Rich Kissel was testifying as the Rule 30(b)(6) witness on behalf of all defendants and noting, "Throughout the case, we've maintained that Brinker International Payroll Company is the proper defendant . . . .").) The court, therefore will continue to refer to the defendants collectively, in the plural, as the plaintiff's former employer.

address that motion before turning to the dispositive motions. As set forth herein, the court will grant that motion in part but will, for the greater part, deny it. Further, the defendants' Motion for Summary Judgment will be granted, and the plaintiff's Motion for Summary Judgment will be denied as moot.

## I.     THE MOTION FOR SANCTIONS

As discussed in greater detail in connection with the parties' summary judgment motions, plaintiff Kean was terminated on November 27, 2018 from his employment as a General Manager of a Chili's restaurant (the "restaurant") operated by the defendants. Kean was 58 years old when he was terminated, and he contends that his termination was because of his age, in violation of the ADEA. (*See* EEOC Charge, Doc. No. 34-12.)

He now moves under Rule 37(e) of the Federal Rules of Civil Procedure and federal common law for sanctions as a result of the defendants' alleged spoliation of evidence. Specifically, he contends that the defendants failed to preserve emails and complaint documents related to the purported reason for his termination, as well as positive performance appraisals conducted near the time of his termination. (Doc. No. 34 at 1.) The defendants deny the accusations of spoliation and assert that sanctions are not warranted.

### A.     Background

In support of his motion, the plaintiff notes that he lodged an internal complaint/appeal with the defendants the day after his termination, asserting that he believed the adverse action was due to his age. When the defendants affirmed that the termination would be upheld, the plaintiff indicated he was going to get an attorney. (*See* Doc. No. 44-2, Kean Dep. 63–64;[2] Doc. No. 34-

---

[2] Many different excerpts from multiple depositions have been filed. The court refers herein to the complete transcripts when available. Because several of the complete transcripts are in

10, at 4, 9.) As a result, according to the plaintiff, the defendants had notice essentially from the date of the plaintiff's termination that this matter might end up in litigation.

Kean filed a *pro se* charge of discrimination with the EEOC on March 1, 2019. (Doc. No. 34-12.) After pandemic-related delays, the EEOC issued a Notice of Right to Sue on August 10, 2022,[3] and Kean, through counsel, filed this lawsuit on November 2, 2022. He filed his first set of written discovery requests on February 15, 2023, among which was included a request that the defendants produce "all documents relating to Plaintiff's termination, including, but not limited to, emails, text messages, other messages, reports, complaints, internal documents, appeal documents and/or separation notices." (Request for Production No. 4, Doc. No. 34-7, at 9.)

In response, the defendants produced what Kean refers to as "Brinker 67–78" or "HR Summary" and the defendants refer to as the Team Member Relations ("TMR") Report. This document appears, on its face, to be a compilation of emails exchanged among management-level employees and human resources ("HR") personnel concerning Jeff Kean.[4] It is unclear when it was created. According to Kean, although the TMR Report "contains and references portions of Outlook emails that were exchanged" among defendants' HR and management personnel concerning him, it does not include "full email chains." (Doc. No. 34, at 6.) In addition, the underlying emails themselves were never produced. In fact, the defendants produced no emails,

_____

condensed format, with four pages per standard page, the court will refer to the original deposition page numbers rather than CM/ECF-assigned page numbers, for ease of reference.

[3] The EEOC issued a Cause Determination in favor of Kean on June 24, 2022 and invited the parties to participate in the conciliation process. (Doc. No. 34-13.) After conciliation failed, the EEOC elected not to bring suit and notified the plaintiff of his right to sue. (Doc. No. 34-14.)

[4] Kean also complains that the compilation was not produced during the EEOC investigation. The documents that were produced to the EEOC are in the record at Doc. No. 34-15. They consist of performance appraisals for the plaintiff from 2012–13 and payroll records for the duration of the plaintiff's employment.

other than a single "*pro forma* email documenting the termination" that was produced after discovery closed on December 8, 2023. (*Id.*)

Kean further objects to the TMR Report on the grounds that "no witness could authenticate [it] [or] explain when it was created or by whom," pointing out that Rich Kissel, as Vice President of Operations for Brinker International Payroll Company, L.P., Florida region, and the Rule 30(b)(6) witness for all of the defendants, did not know the type of program used to create the document or when it was created, and he had never seen a similar compilation. (Kissel Rule 30(b)(6) Dep. 7, 75–78, 228.) According to Kean, all of the relevant decision-makers in this case have admitted that they were never asked to search for or save documents relevant to this lawsuit and that they did not search for or save documents, and very few of them have any specific independent recollection of the plaintiff's termination or their specific role in the event.

The plaintiff further argues that, although the defendants' official position in this litigation is that Kean was terminated because of complaints about the "culture" of the restaurant, the defendants have produced documentation related to only one of these purported complaints and admit that they have no documentation relating to the others. (Doc. No. 34, at 9.) In addition, the defendants have produced essentially no personnel file documents relating to Kean from 2018 through the date of his termination, except for payroll information. However, Tom Mallendine, the Director of Operations ("DO") who was Kean's direct supervisor before being replaced by Marsha Gilbert, the DO who terminated Kean, testified that the employees at Kean's restaurant who responded to semi-annual "MEE" (for "My Employment Engagement") surveys conducted by the defendants provided consistently positive MEE scores relating to their experience working at that particular restaurant. (Doc. No. 40-4, Mallendine Decl.¶¶ 8–9.) In addition, Mallendine conducted annual performance reviews for Kean for the years just preceding his termination, all of which

were "excellent." (*Id.* ¶ 13.) According to Mallendine, these performance evaluations should have been in Kean's personnel file. When he completed the evaluations, he submitted them to the defendants' HR Department (referred to as the "PeopleWorks Department") and kept a copy on his company laptop. (*Id* ¶¶ 11, 13.) When Mallendine "separated" from the company approximately six weeks before Kean, he turned in his company laptop, which would still have contained copies of Kean's performance evaluations and other documents relevant to Kean's employment. (*Id.* ¶ 32.) These documents, however, have never been produced in discovery.

In addition, Marsha Gilbert, the DO who replaced Mallendine and who made the recommendation to terminate the plaintiff, left the defendants' employment in the fall of 2019, several months after the plaintiff filed his EEOC Charge and while its investigation was pending. (Doc. No. 44-4, Gilbert Dep. 16.) When she left, Gilbert also shipped her company laptop back to the defendants. (*Id.* at 31.) At the time, she did not have any paper files. (*Id.*) She would have generated paper documents whenever she conducted "pyramid conversations" when she visited the various GMs whom she supervised, but she was never asked by the defendants to keep any of these and would have thrown them away if any remained in her files when she left Chili's. (*Id.* at 31–32.) She also testified that she did not receive any personnel files for the GMs she managed when she became DO. (*Id.* at 32.)[5]

It appears from the record that, during the relevant time frame, the defendants had not implemented a formal document retention policy. Kissel testified in his Rule 30(b)(6) deposition that, at least during Kean's employment, there "really [was no] Brinker standard that was in place for a consistent records policy," so he could only discuss his personal practices in that regard. (Kissel Rule 30(b)(6) Dep. 15.) Generally, "the maintenance and content of the personnel files was

---

[5] Kean testified that Gilbert never did a performance review of him. (Kean Dep. 49.)

really left up to the supervisors at the time." (*Id.* 24.) He also testified that the company's "complaint investigation practices" were "inconsistent" and that it did not put into place a formal "email and document retention policy" until sometime in 2020 or 2021. (*Id.* 16–17, 70.)

Based on all of these facts, the plaintiff argues that the defendants were on notice of the potential for litigation relating to the plaintiff's termination; had a duty to preserve documents relevant to his employment performance and termination; knowingly failed to take any reasonable steps to preserve evidence, despite notice of its relevance and a duty to do so; recklessly failed to have an effective document retention policy in place; and failed to preserve or produce documents relevant to the plaintiff's claims in this litigation. The plaintiff contends that this course of events permits an inference that the defendants "actively and intentionally destroyed evidence" (Doc. No. 34, at 14) and that, at the very least, it is clear that they failed to preserve evidence they knew was relevant and central to his claims, for which they should be subject to sanctions. As sanctions, the plaintiff requests the following:

- Summary judgment should be granted in favor of the Plaintiff; and/or

- Defendants should not be permitted to use the HR Summary in support of [their] case (whether with respect to dispositive motions or at trial) and [they] should be excluded (except for the following portions admissible for other reasons);[6] and

- Defendants should not be permitted to use the summary of the complaint regarding Rondale Brown (unless Plaintiff opts to introduce it to show the termination was upheld); and

- Defendants should not be permitted to utilize the purported discipline document labelled as Brinker 78 or any of the older performance appraisals that have been produced from 2011 through 2013 unless Plaintiff chooses to use them. Defendants have destroyed the positive evaluations conducted closer in time to Plaintiff's termination and have virtually no personnel file on him since 2013. Being permitted to utilize older appraisals and unsigned forms not even contained in the file or from when

---

[6] The plaintiff clarifies that, if the defendants are barred from introducing or relying on the HR Summary, the plaintiff should nonetheless be permitted to introduce and rely on those portions favorable to his case. (Doc. No. 34, at 15–16.)

Plaintiff was new in the position would distort the image of his performance and be unduly prejudicial; and

- The jury should be instructed that Defendants have been found to have destroyed relevant evidence and that it is entitled to presume that the destroyed evidence would have helped the Plaintiff in this case and would have harmed the Defendants; and

- Plaintiff should receive an award of fees and costs relating to this Motion and the discovery issues underlying it.

(Doc. No. 34, at 15.)

The defendants have filed a Response to the Plaintiff's Motion for Sanctions, in which they assert that the motion should be denied because (1) the plaintiff filed it without conferring with them;[7] (2) the defendants took reasonable steps to preserve electronic information; (3) all information known to exist has been provided to the plaintiff, albeit in "alternative form"; (4) the

---

[7] The defendants accuse the plaintiff of failing to take any steps to determine the truth of his spoliation accusations before filing his Motion for Sanctions and failing to comply with Local Rule 7.01(a)(1), which requires that any motion "must state that counsel for the moving party has conferred with all other counsel, and whether or not the relief requested in the motion is opposed." According to a Supplement to the Motion for Sanctions filed by plaintiff's counsel prior to the defendant's Response, she and counsel for the defendant "conferred on December 5 and 6, 2023 concerning Plaintiff's intention to file this Motion," and "Defendants indicated that they were opposed to it." (Doc. No. 35, at 1.) In her Reply brief, she further points out that the parties filed a Third Joint Motion to Extend Discovery Deadline and Motion to Set Deadline for Spoliation Motion on December 7, 2023, which expressly notes that the plaintiff had referenced the "possibility of filing a spoliation motion" during the parties' conference call with the court on November 29, 2023 and the plaintiff's continuing belief that such a motion would "likely be necessary concerning the employment documents specifically relating to Plaintiff . . . , although he first needs to receive the updated [discovery] and needs to conclude the 30(b)(6) deposition" before making a final determination. (Doc. No. 30, at 1, 2.) The Joint Motion also reflects the defendants' objection to any such motion as "without merit." (*Id.* at 2.) Regardless, the parties proposed a deadline of January 5, 2024 for filing a "motion for spoliation." (*Id.* at 3.) The court subsequently granted the motion in all respects. (Doc. No. 31.) The plaintiff's motion was filed before that deadline expired, on December 27, 2023. (Doc. No. 33.) The defendant objects that these steps do not qualify as "conferring" for purposes of L.R. 7.01 and that the plaintiff never followed up with the defendants about the filing of the motion after the filing of the Joint Motion on December 7, 2023. (Doc. No. 36, at 4.) The plaintiff contends that the motion could hardly have been a surprise in light of the trajectory of discovery and the concerns the plaintiff began raising as early as May 2023. (Doc. No. 45, at 1 n.1.) The court finds that the plaintiff adequately complied with L.R. 7.01(a)(1).

defendants did not engage in culpable conduct; and (5) the plaintiff has not alleged, much less shown, that he has suffered any harm as the result of any missing documents.

Regarding the plaintiff's assertion that the defendants intentionally destroyed information, the defendants have produced and rely upon the Declaration of Larry Hendren, Director of IT Service Operations for defendant Brinker International Payroll Company, L.P. ("Brinker"). (*See* Doc. No. 37, Hendren Decl. ¶ 1.) Hendren attests that, upon receipt of the plaintiff's EEOC Charge on April 17, 2019, Brinker issued a broad Document Hold Notice, a copy of which is attached to Hendren's Declaration, and ensured that it was sent to all of the "relevant individuals in this matter," including:

- "Chili's Murfeesboro"—this is one email to all current managers at Plaintiff's former restaurant;

- "Document Hold"—this is a group of over 50 individuals in Brinker's IT Department who were required to implement a hold on relevant emails;

- "Benefits Requests"—this is a group inbox for Brinker's Benefits Department;

- "Nidya Gonzales"—Ms. Gonzales works in Brinker's Risk Management department. She is included on the Litigation Hold so that Brinker can preserve any existing Workers' Compensation documentation;

- "Savannah James"—Ms. James is Brinker's Hotschedules representative. She is included to ensure that Hotschedules records are preserved;

- "Team Member Relations"—this is a group inbox to Team Member Relations ("TMR"). TMR is issued the Litigation Hold to preserve all documentation of complaints to TMR and the attendant investigations;

- "Cory Dugan"—Mr. Dugan was the VP of Operations for Kean's Region at the time;

- "Marsha Gilbert"—Ms. Gilbert was the Director of Operations for Kean's Territory at the time; and

- "Kimberly Harding", "Brian Pederson"—Ms. Harding was a Peopleworks partner at the time, and Mr. Pederson was a Director of Peopleworks.

(Hendren Decl. ¶ 4; April 4, 2019 Document Hold Notice Email, Doc. No. 37-1.)

The Notice informed recipients that Kean had filed an EEOC Charge and instructed them that they had a responsibility to preserve documents and records relating to the matter. In addition, it stated:

> All records management and/or destruction policies related to the documents described in this notice are suspended and all such categories of documents must be retained and not destroyed.
>
> Please do not destroy, alter, delete or modify any documents or electronically stored information that might be relevant to this case including, but not limited to, Red Books/Digital Red Books, company policy manuals, employment files/performance evaluations, handwritten notes, manager or "desk" files, schedules and attendance records, computer notes, applications, leave of absence records, e-mail or any other electronic communication (e.g., text messages, voice mail messages, social media posts), etc. from the time period Jeff Kean began working for Brinker to the present. This duty to preserve exists regardless of where responsive information may be stored and includes computers, iPads and tablets, smartphones, removable storage devices, etc. Also, please keep in mind that the above mentioned sources of relevant information may include personal computers you use at home, or other locations, or ESI stored on third-party computers, including Internet storage (i.e., Dropbox, iCloud, Google Drive, etc.). You should construe the scope of information to be preserved broadly. When in doubt, the information should be preserved.

(Doc. No. 37-1, at 2.)[8]

Hendren further concedes, however, that "the individuals in Brinker's IT Department who received the . . . 'Document Hold' email inadvertently did not implement the hold. . . . For lack of a better term, the Litigation Hold notice 'slipped through the cracks' or "got lost in the shuffle.'" (Hendren Decl. ¶¶ 5–6.) He asserts that the IT Department did not intentionally destroy any documents. (*Id.* ¶ 7.)

---

[8] According to the defendants, Brinker followed up on the Document Hold email by contacting Gilbert directly to ask her who else should be contacted. Based on her response, Brinker forwarded the Document Hold email to Kissel and Hector Aponte, the PeopleWorks Department "partner" for the Middle Tennessee region at the time. (Doc. No. 36, at 3–4.)The factual basis for this assertion is not clear, however.

The defendants assert that Brinker took reasonable steps to ensure that all relevant actors received the Document Hold notice relating to the plaintiff and that, although the individuals involved in the termination decision now no longer have any clear recollection of that event, that does not mean that the defendants failed to take steps to preserve documents.

Regarding the three categories of documents that the plaintiff contends were either intentionally or recklessly destroyed, the defendants argue that there is no evidence that the allegedly missing documents "ever existed or have not already been produced." (Doc. No. 36, at 5.) First, regarding the complaints about the plaintiff upon which its decisionmakers relied in terminating Kean, the defendants assert that they have consistently told the plaintiff, from the outset of this litigation, that none of these complaints were submitted in writing or reduced to writing, other than documents relating to Rondale Brown, which were preserved and have been produced. The defendants also maintain that the plaintiff cannot claim prejudice resulting from the absence of written documentation of these complaints and that, to the contrary, the existence of such documents would have been helpful to the defendants' case. They assert that they cannot be punished for failing to preserve documents that never existed in the first place.

Regarding the failure to produce the originals of the emails that are compiled in the TMR Report, the defendants rely on the Declaration of Kristen Abraira, employed by Brinker as the Senior Manager for Team Member Relations. (Doc. No. 38, Abraira Decl. ¶ 1.) According to Abraira, TMR Reports generally are "designed to capture all emails regarding the subject of a TMR complaint," and the TMR Report produced by the defendants in this matter, identified as Brinker 67–78, "contains an exact reproduction of the substance of the emails regarding Plaintiff's termination." (*Id.* ¶¶ 3–5.)

She states that the process of compiling the emails into a TMR Report was initiated when the plaintiff called TMR's Hotline on November 28, 2018, the day after his termination. This call went to ServiceNow, Brinker's third-party administrator of the Hotline, which created a TMR case and generated an email to Taylor Haden, Brinker's TMR Coordinator at the time. (*Id.* ¶ 6.) Hadden assigned the case to Kristin Stofer, who then "copied and pasted all emails related to Plaintiff into ServiceNow's platform." (*Id.* ¶¶ 7–8.) In addition, once TMR is involved in an "employment situation," TMR will be included on all emails relating to that "situation," as demonstrated by the 14 pre-termination emails among Gilbert, Kissel, Stofer, and Hector Aponte, as the PeopleWorks partner consulted on the decision. (*Id.* ¶¶ 9, 12.)

The earliest email on the TMR Report, from Gilbert to Stofer, is dated November 17, 2018—notably, before the plaintiff submitted his complaint—and is related to Rondale Brown's complaint about Kean. (*Id.* ¶¶ 10–11; *see also* Doc. No. 34-10, at 8.) The TMR Report contains emails among the management team involved in the termination decision, and it also reflects the investigation into the plaintiff's November 28, 2018 call to the TMR Hotline. (*See generally* Doc. No. 34-10.) As such, according to Abraira, it "accurately captures all documentation regarding the decision to terminate Plaintiff's employment, and the investigation into Plaintiff's complaint regarding his termination." (Abraira Decl. ¶ 15.)

Third, the defendants claim that the "only" evidence that documentation existed in Kean's personnel file that has not been produced is Mallendine's Declaration but that Mallendine does not identify specific performance reviews that he conducted, the plaintiff has no specific recollection of performance reviews conducted by Mallendine, and Gilbert did not receive any personnel files when she took over from Mallendine. Thus, according to the defendants, "it is entirely possible that these documents never existed." (Doc. No. 36, at 8.) However, for purposes of the plaintiff's

motion, they do not dispute that the plaintiff received positive performance reviews prior to his termination. Rather, they insist that they had no obligation to maintain these documents because they were not under notice of pending litigation at the time Mallendine sent his laptop back to the defendants. They also argue that such performance reviews are irrelevant, and the plaintiff is not prejudiced by their absence, because he was terminated "for reasons unrelated to his performance reviews"—namely, the complaints Gilbert received regarding Kean and her perception that he was not fostering the "culture" the defendants desired in the restaurant he managed. (*Id.* at 8–9.)

They argue, in short, that there is no evidence that they failed to take reasonable steps to preserve electronic evidence; that the relevant emails that were inadvertently not preserved have been produced in alternative form, as the TMR Report; that, even if performance reviews for 2014–2018 did exist and have been lost despite issuance of the Litigation Hold, there is no evidence that they were intentionally destroyed. They argue that, because there is no evidence of the defendants' intention to deprive the plaintiff of information at issue in this case, sanctions under Rule 37(e)(2) are not warranted. In addition, they claim that sanctions are not appropriate under Rule 37(e)(1), because the plaintiff has not demonstrated prejudice. Finally, they contend that the sanctions proposed by the plaintiff are wildly overbroad and disproportionate to his claims and that, in any event, it is too early at this juncture to discuss jury instructions.

The plaintiff replies that even the defendants admit that they did not issue a Litigation Hold until April 2019—more than four months after his termination—and have admitted that they did not preserve the emails relating to his termination. The organization as a whole admittedly did not have an effective email or document retention policy in place at the time of the plaintiff's termination, and no one at the company is competent at this point to testify as to whether any other emails existed that were not preserved in the TMR Report, because none of the relevant actors has

a distinct recollection of the process leading to the plaintiff's termination. (*See* Doc. No. 45, at 2 ("[N]obody knows what universe of documents existed.").) He also contends that Abraira's Declaration does not explain how the TMR Report would incorporate emails that were created *before* TMR became involved, "which would ostensibly be the most critical emails," and that Stofer would only have copied and pasted into the TMR Report emails that were actually copied or sent directly to her. (*Id.* at 2–3.) And the record does not reflect that she ever asked the key decisionmakers to forward to her copies of emails that might not have originally included her as a recipient. (*Id.* at 3.) He also contends that Abraira's statement that the TMR Report contains all emails regarding the plaintiff's termination is belied by the fact that the defendants belatedly produced the email "showing the actual termination" (*see* Doc. No. 34-17) and that the TMR Report contains emails "copied . . . from unidentified individuals." (Doc. No. 45, at 3.)

The plaintiff also argues generally that the missing documents are all the more critical in his case, because, as mentioned, none of the relevant decisionmakers has a clear recollection of the plaintiff's termination or their involvement in it. He also argues that it is disingenuous for the defendants to suggest that performance evaluations for 2014–2018 might never have been created and that he is clearly prejudiced by the missing performance evaluations, based on testimony that "key performance indicators" or "KPIs" were "one important factor" the defendants looked at to "gauge a store's culture." (Doc. No. 45, at 4–5.)[9] He argues, further, that courts within the Sixth

---

[9] The parties have not clarified whether the defendants have produced KPI reports and MEE surveys for the plaintiff's restaurant during the relevant time frame. At least some of them are in the record, and they appear to be corporate documents that are not related to individual performance appraisals. (*See, e.g.*, Doc. No. 40-8, at 6–1.) The defendants state that they have produced the "documents it maintains at the corporate level regarding Plaintiff." (Doc. No. 36, at 7.)

Circuit have held that, to demonstrate prejudice, a party moving for sanctions need only show that the spoliated evidence "*could* have been useful to [the party's] claim or defense." (*Id.* at 6.)

### B.    Legal Standards

Rule 37(e) pertains to the failure to preserve electronic information. It states as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>>
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Thus, before the court even considers sanctions, a party bringing a motion under Rule 37(e) must show, as a threshold matter, that "(1) electronically stored information that should have been preserved 'in the anticipation or conduct of litigation' was lost; (2) the party who had a duty to preserve the information 'failed to take reasonable steps to preserve' it; and (3) the information 'cannot be restored or replaced through additional discovery.'" *Adamczyk v. Sch. Dist.*, 667 F. Supp. 3d 534, 556 (E.D. Mich. 2023) (citing P*rudential Def. Sols., Inc. v. Graham*, No. 20-11785, 2021 WL 4810498, at *5 (E.D. Mich. Oct. 15, 2021)).

If that showing is met, the next question is whether some sanction is warranted. Notably, subsection (e)(1) contains no "intent" requirement—it requires only the loss of information and prejudice to the moving party, in which case the court "may order measures no greater than

necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). The court has "broad discretion in crafting spoliation sanctions under Rule 37(e)(1)." *Graham*, 2021 WL 4810498, at *5; *see also* Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

Under subsection (e)(2), if the court finds that the party that caused the loss "acted with the intent to deprive another party of the information's use in the litigation," then it may—but is not required to—order sanctions based on Rule 37(e)(2)(A)–(C), even in the absence of any showing of prejudice to the moving party. The most severe spoliation sanctions are appropriate only if there is a finding of intent; "[a] showing of negligence or even gross negligence will not do the trick." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016).

As for non-electronic evidence, to which Rule 37(e) does not apply, federal district courts have "broad discretion" under their "inherent power to control the judicial process" to "craft proper sanctions for the spoliation of evidence." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (citation omitted). In this context, "[s]poliation is 'the *intentional destruction* of evidence that is presumed to be unfavorable to the party responsible for its destruction.'" *Ross v. Am. Red Cross*, 567 F. App'x 296, 301–02 (6th Cir. 2014) (quoting *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003) (emphasis added)). The Sixth Circuit has explained the standard for determining whether a spoliation sanction is appropriate as requiring the party seeking such a sanction to establish

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (internal quotation marks and citation omitted); *see also Goodale v. Elavon, Inc.*, No. 23-5013, 2023 WL 9111441, at *4 (6th Cir. Dec. 12, 2023). This test is "conjunctive." *Adkins*, 692 F.3d at 504.

"An obligation to preserve may arise when a party should have known that the evidence may be relevant to future litigation." *Id.* (citation omitted)." A party's "culpable state of mind" may be established "by a showing that the evidence was destroyed knowingly, even if without intent to [breach a duty to preserve it], or *negligently*." *Id.* at 554 (internal quotation marks and citation omitted; alterations in original). As for relevance, the question is not "whether the lost or destroyed evidence was dispositive." *McCarty v. Covol Fuels No. 2, LLC*, 644 F. App'x 372, 379 (6th Cir. 2016). "[R]ather, the party seeking a spoliation sanction must 'ma[ke] some showing indicating that the destroyed evidence would have been relevant to the contested issue.'" *Id.* (quoting *Beaven*, 622 F.3d at 554) (some internal quotation marks omitted).

When a court determines that spoliation of non-electronic evidence has occurred, warranting a sanction,

> its severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality. Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.

*Beaven*, 622 F.3d at 554 (internal brackets, quotation marks, and citations omitted).

### C. Discussion

#### 1. The Failure to Preserve Emails

Kean asserts that the defendants should be sanctioned for failing to preserve emails relevant to the termination decision. Emails, by definition, qualify as electronically stored information ("ESI"), and a failure to preserve them is governed by Rule 37(e). It is effectively undisputed that the defendants failed to preserve or produce any emails in response to discovery, aside from the HR Summary compiled by Kristin Stofer.

The first threshold question is whether the lost information should have been preserved "in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). The answer to this question is yes. The defendants clearly incurred a duty to preserve relevant information as soon as they were on notice that the plaintiff believed that he might have been terminated on the basis of his age and had threatened litigation. As preserved in the TMR Report, this occurred on November 28, 2018, when Kean "called in and filed wrongful termination," indicating that he "would like more clarity on the matter and is unsure if this has something to do with his age." (Doc. No. 34-20, at 5–6; *see id.* at 9 ("He was terminated yesterday and believes it was a wrongful termination. He believes it was related to his age but is unsure as he was given a generic reason . . . .").) In case there were any ambiguity, Stofer documented that, when she spoke with him two days later, he threatened litigation, stating that he would "get to the bottom of this with his attorney." (Id. at 4.) This threat of litigation, in conjunction with the plaintiff's articulated suspicion that his termination was age-related, was sufficient to put the defendants on notice of a duty to preserve documents related to such a claim. *See, e.g.*, *Stevenson v. City & Cty. of San Francisco*, No. C-11-4950 MMC, 2015 WL 6177363, at *4 (N.D. Cal. Oct. 21, 2015) ("Before litigation begins, courts agree that the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence." (quoting *In re Ethicon, Inc. Pelvic Repair Systems Product Liability Litig.*, 299 F.R.D. 502, 512 (S.D. W.V. 2014)). This knowledge should have triggered a litigation hold at that point, but the defendants did not formally issue a Litigation Hold until April 17, 2019, sometime after receiving notice of the plaintiff's March 1, 2019 EEOC Charge. (*See* Doc. No. 37-1.)

As for whether the defendants "failed to take reasonable steps to preserve" electronic information relevant to the plaintiff's claim, the defendants assert that the Litigation Hold they

issued in April 2019 establishes that they took reasonable steps to preserve information and that the IT department's apparently inadvertent failure to implement that hold does not mean that the defendants themselves acted unreasonably. The plaintiff disputes whether the defendants acted reasonably, based on their failure to implement any kind of company-wide document-retention policy governing the storage of emails, failure to implement a litigation hold in November 2018, and then failure to effectively implement the Litigation Hold it finally did issue in April 2019.

The court finds that the scant available evidence on this element is sufficient to give rise to an inference that the defendants did not act reasonably. Notably, that the Litigation Hold "slipped through the cracks" or "got lost in the shuffle" at the IT department (Hendren Decl. ¶ 6) does not explain why none of the other individuals or departments to whom or to which the Litigation Hold was issued (notably including Marsha Gilbert, Rich Kissel, Hector Aponte, and the TMR department as a whole) failed to preserve emails (or to produce them in response to the EEOC investigation). The defendants have proffered no information regarding what follow-up efforts its legal department made with the relevant decisionmakers following the issuance of the Litigation Hold to ensure that it was received and implemented. In addition, the defendants have offered no explanation for why the TMR department failed to notify the legal department or to issue a litigation hold in November 2018, upon the plaintiff's initial threat of litigation based on wrongful termination.[10]

---

[10] The defendants assert that the reasonableness of their efforts to preserve documents is established by the fact that such efforts "resulted in the preservation and production of 619 documents in this matter." (Doc. No. 36, at 10.) It is unclear what these documents are. As noted above, it is not clear whether the defendants have produced KPI reports and MEE surveys maintained at the corporate level for the relevant time frame. In any event, that the defendants produced some documents does not necessarily establish their reasonableness in failing to preserve other documents.

Third, it is also clear that the original emails themselves from the electronic files of those individuals involved in the termination decision "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). The defendants concede that the "originals of emails regarding Plaintiff's termination . . . were not preserved despite Brinker's efforts" (Doc. No. 36, at 9–10), and discovery has now closed without the defendants' having restored the lost original emails.

Finding that the plaintiff has made the requisite showing that unrecoverable electronically stored information was lost because the defendants failed to take reasonable steps to preserve it, the court must consider both whether the plaintiff has been prejudiced by the loss and whether the defendants acted intentionally. With respect to whether the defendants acted "with the intent to deprive" the plaintiff of the use of the emails in this litigation, the court finds no evidence of such an intent. The plaintiff argues very generally that the defendants acted in "a grossly negligent or reckless manner and at worst, they acted intentionally," so as to warrant sanctions. (Doc. No. 45, at 1; *see also* Doc. No. 34, at 13 (asserting that the defendants were either reckless or, at a minimum, negligent, for failing to implement any document or email retention policies).) The plaintiff, however, is conflating the standard applicable to ESI under Rule 37(e) and the common law standard that applies to non-ESI. Rule 37(e) makes a clear distinction between intentional and merely negligent conduct. *See, e.g.*, *Applebaum*, 831 F.3d at 745 (observing that, for a court to issue sanctions under Rule 37(e)(2), "[a] showing of negligence or even gross negligence will not do the trick"). With regard to intent, the defendants have established that they did issue a broad Litigation Hold, albeit somewhat belatedly, and that they preserved and produced the TMR Report. While they appear to have been very cavalier with respect to their document-retention policies, there is insufficient evidence to support an inference that they acted intentionally to deprive the

plaintiff of documents in this litigation. The plaintiff is not entitled to sanctions under Rule 37(e)(2).

For sanctions under Rule 37(e)(1) to be warranted, the plaintiff must prove prejudice. This issue presents a very close call. According to Kristen Abraira, the TMR Report was "designed to capture all emails regarding the subject of a TMR complaint," and the TMR Report produced in this case "contains an exact reproduction of the substance of the emails regarding Plaintiff's termination." (Abraira Decl. ¶¶ 3–5.) She also attests that, once a complaint involving TMR is made, TMR will be included on all emails relating to that complaint. (Id. ¶¶ 9, 12.) And, indeed, the TMR Report in this case appears to capture the substance of the discussion that led to the plaintiff's termination.

On the other hand, as the plaintiff points out, he was deprived of the opportunity to see what other emails concerning him might have been exchanged among management personnel on which Kristin Stofer was not included and that predated his termination. In addition, that possibility is not disputed by any competent evidence, because the relevant decisionmakers have testified that they have virtually no recollection of the plaintiff or his termination, and certainly little or no recollection of whether or to what extent they communicated with each other about the plaintiff prior to his termination. While the existence of such emails is subject to some speculation, the plaintiff has plausibly suggested that the complete email files of the relevant decisionmakers might have contained information relevant to his termination and the decisonmaking process. For purposes of Rule 37(e)(1), this is sufficient to show prejudice. *Accord McCarty*, 644 F. App'x at 379 (observing that courts are not to impose a "heightened relevancy standard" and that the proper inquiry is whether the movant has made "some showing indicating that the destroyed evidence would have been relevant to the contested issue" (quoting *Beaven*, 622 F.3d at 554); *Yoe v.*

*Crescent Sock Co.*, No. 1:15-cv-3-SKL, 2017 WL 5479932, at *11 (E.D. Tenn. Nov. 14, 2017) (citing cases finding that prejudice may be established by "plausible, concrete suggestions as to what [the destroyed] evidence might have been"); *Jones v. Staübli Motor Sports Div.*, 897 F. Supp. 2d 599, 609 (S.D. Ohio 2012) (finding that the prejudice element "require[s] only that a party show that a reasonable trier of fact *could* find that the missing evidence would support that party's claim" (citing *Beaven*, 622 F.3d at 533)).

In this situation, the court finds that the plaintiff has established that he suffered some prejudice as the result of an inadvertent loss of potentially relevant information. The court, therefore, *may* order "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Virtually all of the measures the plaintiff requests are vastly disproportionate to the prejudice he might have suffered, however. The court does not find it appropriate, for instance, to grant summary judgment in favor of the plaintiff on the basis of the possibility of missing emails, or to exclude altogether the TMR Report, as the plaintiff requests, simply because other emails discussing his termination might have existed.

Nor is the court persuaded, under the circumstances here, that it would be appropriate to instruct the jury, should the case go to trial, that the defendants have been found to have "destroyed relevant evidence and that it is entitled to presume that the destroyed evidence would have helped the Plaintiff in this case and would have harmed the Defendants." (Doc. No. 34, at 15.) To the extent the plaintiff wants the jury to draw an inference that the defendants must have talked about his age as a factor influencing the termination decision, no such inference is warranted.

Finally, however, the plaintiff requests an award of costs and attorney's fees relating to his motion. Although the advisory committee notes to the 2015 amendment do not address the propriety of monetary sanctions, they do recognize that the "range" of curative measures

appropriate under Rule 37(e)(1) is "quite broad." Moreover, "[m]any courts have imposed monetary sanctions under Rule 37(e)(1)." *Schnatter v. 247 Grp., LLC*, No. 3:20-CV-00003-BJB-CHL, 2022 WL 2402658, at \*19 (W.D. Ky. Mar. 14, 2022) (citing *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 237–38 (D. Minn. 2019)); *see also Spencer v. Lunada Bay Boys*, No. 16-cv-2129, 2018 WL 839862, \*1 (C.D. Calif. Feb. 12, 2018) (collecting cases)).

The court finds that relevant emails that would have assisted the plaintiff to establish any claim or defense in this case may have existed and may have been destroyed. However, requiring the defendants to pay the reasonable costs and attorney's fees incurred by the plaintiff in prosecuting the instant motion would sufficiently "ameliorate[] the economic prejudice imposed on the [plaintiff]" and is no harsher than necessary to cure that prejudice. *Accord Schnatter*, 2022 WL 2402658, at \*19 (citing *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016)).

## 2. The Purported Failure to Maintain Complaints About the Plaintiff

The plaintiff objects to the defendants' failure to produce any documentation in writing about the purported complaints against him by the individuals identified in the defendants' correspondence with the EEOC (Melissa Stonestreet, Eric Forrest, and Chris Flater). He points out that the defendants "admit" that they have no such documents. (Doc. No. 34, at 9.) Although documentation of the complaint by Rondale Brown has been produced, the plaintiff complains that it is incomplete. (*Id.* at 8 n. 44.)

In response, the defendants assert that the plaintiff has no evidence suggesting that any of the complaints against the plaintiff, other than the complaint by Rondale Brown, was ever reduced to writing. They argue that the absence of documentation most likely means that documents never existed in the first place. They also assert that the absence of documentation of the complaints harms the defendants far more than the plaintiff himself.

The record reflects that Marsha Gilbert testified that Melissa Stonestreet complained directly to her; she did not recall whether she asked Stonestreet to put her complaint in writing or whether she ever involved the PeopleWorks Department. (Gilbert Dep. 96–97.) Gilbert remembered little about the complaint. (*Id.* at 99.) Kissel testified that, when a DO receives a complaint about a manager at Chili's, the normal policy would be to involve a PeopleWorks Partner. Regarding whether the complaint would be put in writing, Kissel stated that "[e]very situation is different" and it was "really up to the HR practitioners." (Kissel Dep. 60.)

The court finds that there is insufficient evidence in the record from which to conclude that documents—electronically stored or not—were ever created, much less evidence from which the court can conclude that they were lost through the fault of the defendants. And, even if the court could presume that such information was created and then lost, its absence is likely to hurt the defendants more than it prejudices the plaintiff, insofar as the defendants seek to rely on undocumented complaints to establish cause for the plaintiff's termination, while the plaintiff may argue that such undocumented complaints did not actually occur—or at least were not serious enough to warrant documentation, much less termination. The court does not find that sanctions are warranted in connection with the defendants' purported failure to produce documentation of complaints about the plaintiff.

### 3. *Performance Appraisals*

Regarding the performance appraisals, there is evidence in the record in the form of the Declaration of Tom Mallendine, who supervised the plaintiff prior to Marsha Gilbert, attesting that he conducted annual performance evaluations for all of his GMs, including Kean. (Doc. No. 40-4, Mallendine Decl. ¶¶ 10, 12.) Once the evaluations were completed, Mallendine submitted them in paper form to PeopleWorks and kept a copy on his laptop. (*Id.* ¶ 11.) Mallendine rated Kean as "excellent" on all of his evaluations, as a result of which Kean routinely received annual pay

increases and bonuses. (*Id.* ¶¶ 13, 14.) Mallendine believes that Kean's evaluations should be in his employee file. (*Id.* ¶ 13.) Mallendine's employment with Brinker ended in October 2018, after which he returned his company laptop to Brinker, still containing electronic copies of the performance evaluations, as well as other documents "relevant to [Kean's] employment." (*Id.* ¶¶ 25, 32.)[11]

At the time Mallendine was terminated, the company does not appear to have been on notice that it needed to keep any documents relating to Kean that might have been retained in electronic format on Mallendine's company laptop. As a result, the plaintiff cannot establish that these documents fall within the scope of Rule 37(e). Similarly, while it is arguable that the paper evaluations *should* have been maintained in the plaintiff's personnel file,[12] the defendants state that they have "produced the documents [Brinker] maintains at a corporate level regarding Plaintiff" but that, at the time of Kean's termination, the defendants did not have a "consistent policy regarding maintenance of personnel files." (Doc. No. 36, at 7; *see* Kissel Rule 30(b)(6) Dep. 24–25 (testifying that, as of 2018, DOs did not receive any training with respect to the maintenance of personnel files and that the maintenance and content of personnel files for individuals under their supervision was largely left to the discretion of each supervisor).)

Thus, while it seems clear that performance evaluations were created for the plaintiff and were not maintained, it does not appear that they were destroyed at a time when the defendants were on notice of potential litigation and, therefore, under an obligation to preserve them. This is step one of the *Beaven* test discussed above. *Beaven*, 622 F.3d at 553. Because the test is

---

[11] Mallendine's separation from the company occurred just the month prior to Kean's termination.

[12] Because a new supervisor was taking over, it certainly seems like an unwise business practice not to maintain the evaluations of the supervisees for the edification of the new supervisor.

conjunctive, *Adkins*, 692 F.3d at 504, the fact that there is no evidence of an obligation to preserve the appraisals, the plaintiff cannot establish that a spoliation sanction is warranted.

That said, even if the court were to presume that all of the *Beaven* factors were satisfied and that some sanction would be warranted based upon the defendants' negligent failure to preserve the performance appraisals in the plaintiff's personnel file, the most effective sanction would have been a jury instruction permitting the jury to presume that the lost documents would have been favorable to the plaintiff. But the plaintiff here has no need of such an instruction—he has Tom Mallendine's testimony affirming that his evaluations of the plaintiff were, in fact, not merely positive but "excellent" and that he had never received any complaints about the plaintiff. In other words, given Mallendine's ability to testify as to what the performance appraisals said, the plaintiff is not actually prejudiced by the loss of the paper documents, and no sanction would be more effective than Mallendine's actual testimony. Moreover, as set forth above, the court has already determined that it is appropriate for the defendants to pay the plaintiff's costs and attorney's fees associated with this motion.

### 4. Conclusion

The only documents, electronic or otherwise, that appear actually to have been lost or destroyed due to the defendants' negligence at a time when the defendants were on notice of potential litigation by the plaintiff, and therefore under an obligation to preserve them, are the emails related to the plaintiff's termination. While it appears that the relevant emails exchanged with the relevant actors and the TMR department may have been preserved in the TMR Report, it is clear that the actual emails created by the employees involved in the termination decision were not preserved or produced. As a result, the plaintiff has established that documents relevant to his claims or defenses have been lost. As a sanction for the defendants' apparently grossly negligent failure to preserve ESI when it was on clear notice of the potential for litigation in connection with

the plaintiff's termination, the court will order the defendants to reimburse the plaintiff for the costs and attorney's fees associated with the filing of this motion. In light of the absence of any indication that the plaintiff's ability to pursue his claims has actually been harmed by the defendants' failure to maintain documents, the court finds no other sanction warranted.

## II.     THE MOTIONS FOR SUMMARY JUDGMENT

### A.     Standard of Review

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set

forth specific facts showing that there is a genuine issue for trial. *Id.* at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

The party asserting that a fact cannot be, or genuinely is, disputed must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment). In other words, the appropriate focus under Rule 56, as amended in 2010, is on the admissibility of a fact at trial, not necessarily the admissibility of the fact in the specific form presented at the time of the summary judgment motion. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018).

Finally, the standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). In evaluating cross motions, the court must consider "each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

**B.** **The Defendants' Motion**

With their Motion for Summary Judgment, the defendants filed a supporting Memorandum of Law (Doc. No. 43), Statement of Material Facts (Doc. No. 44), and a substantial quantity of evidentiary material, including deposition transcripts, witness declarations, and documents produced in discovery. The plaintiff filed a Response (Doc. No. 48), a "Response to Defendants' Statement of Claimed Undisputed Material Facts and Plaintiff's Own Statement of Disputed or Undisputed Material Facts that Make Summary Judgment Inappropriate" ("Response to SUF" and "SAMF") (Doc. No. 49), and additional (and often duplicative) evidentiary material.[13] The defendants filed a Reply and a Response to the SAMF. (Doc. Nos. 51, 52.)

*1.*    *Facts*[14]

Plaintiff Jeff Kean's date of birth is December 9, 1959. In May 2011, when he was 51 years old, he was hired to work as General Manager ("GM") at a Chili's restaurant near Vanderbilt University in Nashville, Tennessee. Chili's is one of the restaurant brands operated by the defendants.

During his time working for the defendants, Kean worked at several different Chili's restaurants in the Nashville market. As GM, he was ultimately responsible for "all four walls" of whichever Chili's location to which he was assigned. (Doc. No. 44-2, Kean Dep. 20; *see id.* ("You

---

[13] The court's Local Rules contemplate that a party responding to a summary judgment motion may file a "concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends *there exists a genuine issue to be tried.*" L.R. 56.01(c) (emphasis added). This rule does not authorize the filing of a statement of additional facts that are not disputed or that are completely redundant of the facts set forth in the defendant's statement of facts. Many of the facts in the plaintiff's SAMF are both redundant and undisputed.

[14] The facts set forth here are either undisputed for purposes of the defendants' Motion for Summary Judgment or viewed in the light most favorable to the plaintiff, as the non-movant with respect to the defendants' motion. The facts for which no citation is provided are drawn from the plaintiff's Response to Defendants' SUF (Doc. No. 49) or the defendants' Response to the Plaintiff's SAMF (Doc. No. 52).

had to deal with sales, scheduling, profits, employee stuff, relations-type stuff, training, sales building, guest contact. Just about everything that you could possibly know in a restaurant.").) While Kean was GM, Chili's "culture" was "everything Chili's talked about." (Kean Dep. 108.) It was a "daily topic for how to handle team members, how to handle managers, to . . . the metrics of the restaurant, how it affects turnover, things like that." (*Id.*) These were "conversations Chili's has in all of their meetings, conversations . . . . [E]very time they have a convention, they talk about those things." (*Id.*)

According to the defendants, Chili's aimed for a "supportive positive culture." (Kissel Rule 30(b)(6) Dep. 111.) Kean believes that Chili's true culture was that it was "looking for younger models to deal with that could relate to the younger team members better," and he "didn't fit that picture." (Kean Dep. 106.) He also points out that Chili's Employee Handbook outlines five "Cultural Beliefs" that "define [its] culture," including (1) "Feedback's Priceless" ("I see more through your feedback."); (2) "Own It" ("I own, drive and achieve key results."); (3) "Trust Matters" ("I act in a manner that cultivates trust in others."); (4) "Win Together" ("I work across boundaries to achieve key results."); and (5) "Thinking Forward." ("I think and act in a manner to deliver desired future results."). (Doc. No. 49-1.) The "Key Results" referenced under the Cultural Beliefs are (1) Engage Team Members; (2) Bring Back Guests; (3) Grow Sales; and (4) Increase Profits. (*Id.*)

In 2015 or 2016, Allen Pitts, then the Director of Operations ("DO") assigned to the plaintiff's region and, as such, Kean's direct supervisor, requested that Kean be transferred to a Chili's restaurant in Murfreesboro, Tennessee ("Chili's Murfreesboro"). The Chili's Murfreesboro was a troubled location, experiencing high employee turnover and problems with sales, guests, and costs. According to the plaintiff, he was transferred to this restaurant because Pitts "needed

someone with more experience to run it" and "wanted [him] to go fix it." (Kean Dep. 17.) It was also a larger restaurant and typically was staffed by three assistant managers to support the GM.

Eric Bean was one of Kean's assistant managers while he was assigned to Chili's Murfreesboro. Bean was Kean's "second in command." (Kean Dep. 33.) As second in command, Bean would assume the GM's responsibilities if Kean was unavailable or had the day off.

At some point in late 2017 or early 2018, approximately two years after his assignment to Chili's Murfreesboro, Kean's then-DO, Tom Mallendine, made that restaurant a training location for Managers in Development ("MIDs"). Management training restaurants must meet the highest standards of excellence to be selected as such. After Chili's Murfreesboro became a training location, Kean was required to oversee MIDs' schedules, conduct orientation, ensure they completed their book work and online training modules, and make sure they were exposed to the tools they would need to run a restaurant. While the plaintiff was at Chili's Murfreesboro and supervised by Mallendine, he earned positive annual performance evaluations and received consistent pay raises. Mallendine left the company in September 2018.

Shortly after Mallendine's departure, Rich Kissel became the Vice President of Operations ("VPO") for the region that included the Nashville market generally and Chili's Murfreesboro specifically. (Doc. No. 44-1, Kissel Dep. 62.) As VPO, he supervised the DOs within his region, and he made the decision to promote Marsha Gilbert to replace Mallendine as DO. For personnel matters, he relied on Hector Aponte as his PeopleWorks Partner.[15]

---

[15] "PeopleWorks" is the defendants' HR department. It is not clear whether the PeopleWorks Department and the TMR Department are the same or different.

Melissa Stonestreet was an MID assigned to Chili's Murfreesboro in mid-October 2018. She was 42 years old at the time.[16] She was the only MID assigned to Chili's Murfreesboro. According to Kean, Gilbert and Stonestreet were "[r]eally good friends," and Stonestreet got her job with Chili's because of Gilbert. (Kean Dep. 51–52.)

Stonestreet complained to Gilbert about her training experience with Kean. In November 2018, Gilbert called Kean and told him that she was pulling the training function from his restaurant "due to complaints she had received." (Kean Dep. 58.) Kean knew she was talking about Stonestreet, because Stonestreet was his only trainee at the time. (*Id.*) No one ever asked Kean or any of his assistant managers about Stonestreet or took any effort to verify her complaint. Gilbert never reported Stonestreet's complaint to the PeopleWorks Department.

According to the plaintiff, his initial conversation with Gilbert was brief, because he was at a school function with his daughter, but he called Gilbert back a little while later to tell her that he thought it was "very unprofessional" for her to call him on his day off and disrespectful to him and his staff to make this decision without ever being in his restaurant. (Kean Dep. 59.) He also told her it was "fine," and he "didn't wish to do any more training any more in that restaurant." (*Id.* at 60.)

Not long after that exchange, on November 17, 2018, Gilbert reported to Kristin Stofer, a Team Member Relations ("TMR") Specialist, that she had received a complaint from Rondale Brown regarding Kean. (*See* Doc. No. 34-10, at 8.) Brown was a server whom Kean had terminated on that date and who felt that his termination was unjustified. (*See id.*) Stofer contacted Brown on November 19, 2018 to follow up on this complaint. Brown told Stofer that the environment in the

---

[16] Although it is now undisputed that she was 42 years old in October 2018, the plaintiff alleged in his Complaint that Stonestreet "appeared to be approximately 25 years old." (Doc. No. 1 ¶ 20.)

Chili's Murfreesboro restaurant was "very tense and stressful for the [team members]" when Kean was around. (*Id.*) Brown also claimed that Kean did not care for him and treated him poorly and that another team member had told Brown that "the GM was being racist towards him." (*Id.*)

Stofer relayed this information to Gilbert and Kissel, while also noting, "We had received concerns on [Kean] in the past for a hostile work environment . . . which we were not able to substantiate but we did have a documented results pyramid[17] conversation with him in September." (*Id.*) Kean denies that he ever received any form of discipline prior to being terminated by Gilbert. (Kean Dep. 111.) He also points out that his personnel file contains no disciplinary documents. (*See* Kissel Dep. 166.)

In any event, the TMR Report shows that Gilbert asked Aponte for help and that the two had a telephone conversation about Kean shortly thereafter. (Doc. No. 34-10, at 7–8.) Gilbert then emailed Kissel and informed him that she and Aponte had agreed "that we need to move forward with the term on [Kean]. The guest and team member complaints, as well as the MID training concerns, all confirm that [Kean] is not the leader we need in Murfreesboro." (*Id.* at 7.) Her "plan" for Chili's Murfreesboro was to promote Bean to GM. (*Id.*) Stofer expressed reservations, noting:

> To my knowledge, [Kean] has only received a documented pyramids conversation and no other documentation. I only know of the concerns that were voiced when I looked into it in September, where 2 TMs did have concerns about his behavior. I support whatever you decide, I just want to ensure we are confident that we did everything we could to set him up for success prior to moving to termination.[18]

---

[17] Gilbert testified that anytime a DO visited a GM at a restaurant, a "pyramid discussion happened," basically a coaching conversation. (Gilbert Dep. 27–28.)

[18] Again, the defendants have not produced a "documented pyramid." However, the same TMR Report contains a reference to an inquiry by Kean about a complaint against him by an MID named Wendell Newsome on September 12, 2018, for "bullying behavior." (Doc. No. 34-10, at 1.)

(*Id.* at 7.) However, Kissel, in consultation with Aponte, agreed and accepted Gilbert's recommendation to terminate Kean.[19]

On November 27, 2018, Gilbert met with Kean and told him he was terminated because they wanted to create a different culture in his restaurant. Gilbert had never been in Kean's restaurant until the day she terminated him. (Kean Dep. 49.) He stated in his Complaint that she "acted and appeared much younger and very trendy" (Doc. No. 1 ¶ 19), apparently meaning that she seemed much younger than Mallendine (*see id.* ¶ 18), who was in his mid- to late-fifties at the time (*see* Kean Dep. 24). However, Gilbert was born in 1966 and would have been 52 years old in October 2018. (Doc. No. 44-4, Gilbert Dep. 6.) Kissel was born in 1972. He was 45 years old when he promoted Gilbert and 46 when Kean was terminated. Aponte was born in 1972 and was thus roughly the same age as Kissel.

The defendants have consistently maintained that restaurant culture was the reason for Kean's termination. As set forth above, culture was "everything Chili's talked about" and a "daily topic" of discussion. (Kean Dep. 108.) When Gilbert notified the plaintiff why they were terminating him, he protested that she could not "possibly know what the culture is" since she had never been in his restaurant before the day she terminated him and had never talked to any of his

---

[19] Before Kean was actually terminated, Stofer reported back to the "team" that she had connected with him about Rondale Brown. Kean's version of the events leading to Brown's termination was that Brown had been "a performance issue from the time he started," was defensive and argumentative when anyone tried coaching him, had been told many times that he needed to get permission and coverage for his tables before taking cigarette breaks, and, the last time Kean talked to him about taking unapproved cigarette breaks mid-shift, responded by telling him, "you aren't my daddy I don't have to listen to you." (*Id.* at 6.) Stofer recommended upholding the decision to terminate Brown based on "insubordination/negative confrontation with manager and performance concerns." (*Id.*) She also reported that Brown was "thankful for us looking into his concerns and did not discuss with me coming back on board. His main concern was hostile work environment by manager." (*Id.*) Kissel noted that he agreed with upholding the termination but that the "GM has failed the TM by not documenting any conversations." (*Id.*)

team members. (Kean Dep. 61.) She did not respond and instead directed him to gather this "stuff" and leave immediately. (*Id.*) As Kean was leaving, he told Gilbert, "I'm not sure who promoted you or why you've been promoted, but I can tell you that you're not going to last very long when you're making decisions like this." (Kean Dep. 63.)

It is undisputed that Kissel and Gilbert did not consider Kean's Key Performance Indicator ("KPI") Reports before terminating him, nor did they review Kean's scores on employee engagement surveys, referred to as "MEE" surveys (for "My Employment Engagement"). The plaintiff's KPI Reports and MEE surveys conducted earlier in 2018 were excellent. It is undisputed that restaurant culture includes many different factors, including subjective factors that cannot be ascertained from KPIs or MEEs.

According to the defendants, Gilbert and Kissel did not know Kean's age at the time of the termination decision. (Doc. No. 44-6, Gilbert Decl. ¶¶ 4, 5; Doc. No. 44-7, Kissel Decl. ¶¶ 4–5.) Gilbert never reviewed Kean's personnel file. (Gilbert Dep. 95.) According to Kissel, when Gilbert brought her concerns about Kean to his attention, they did not discuss age in any way. (Kissel Decl. ¶ 6.) Kean purports to dispute this testimony, pointing to testimony from both Kissel and Gilbert establishing that they had both met him prior to his termination. Gilbert, in fact, testified that, when she was GM at the Chili's Cookeville, she and Kean would have been "colleagues" within the same geographic region and would have participated in the same regular (either quarterly or monthly) daylong GM meetings. (Gilbert Dep. 92–93.) Kissel, for his part, "vaguely recall[ed] meeting" Kean during a restaurant visit at some point. (Kissel Dep. 128.)

Kean also points out that neither Gilbert nor Kissel remembers what they discussed when Kean was terminated. Gilbert, to be sure, had virtually no recollection of the details of the

plaintiff's termination.[20] Kissel recalled that he would have had one or two telephone discussions with Aponte and Gilbert, but he did not appear to remember much about the event aside from what was reflected in the emails in the TMR Report. (Kissel Dep. 129, 132–33.) Neither Stofer nor Aponte has any independent recollection of the plaintiff's termination or their involvement in it. (Doc. No. 48-14, Aponte Decl. ¶ 4; Doc. No. 48-21, Stofer Decl. ¶ 4.)[21]

The plaintiff believes that age played a role in Gilbert's decision to terminate him, but he points to no concrete evidence to support that supposition. He stated, "I don't think she really knew how to manage me because I had a lot of experience." (Kean Dep. 93.) He had the impression that Gilbert saw him as "a threat for some reason," but the only reason he gave for that impression was that "she fired [him]." (*Id.* at 94, 96.) His belief that she wanted someone younger was based on the fact that she fired him for no reason and promoted Eric Bean, who was younger, to replace him. (*Id.* at 95–96.)

Similarly, asked about an email exchange with the EEOC addressing whether his "questioning Ms. Gilbert played a part in her decisions," Kean stated that he "absolutely" believed that his questioning Gilbert related to his age, because he believed that Gilbert did not "like[] the fact that [he] would even ask a question." (Kean Dep. 118.) In his mind, "she wanted someone else in that position that she could . . . get them to do exactly as she wanted without question." (*Id.*) His

---

[20] She also testified that she was on medication that affected her memory. (Gilbert Dep. 129.)

[21] Neither Aponte nor Stofer is still employed by the defendants. (Aponte Decl. ¶ 3; Stofer Decl. ¶ 3.)

being older and more experienced, that is, made him more "comfortable asking questions" and willing to "question certain things." (*Id.* at 118–19.)[22]

The day after his termination, Kean spoke with Kristen Stofer and made an internal complaint of "wrongful termination," expressing his belief that he had been terminated due to his age. Stofer reported this complaint to the same "team" that had been in communication about whether to terminate him, and she reiterated her concern about the absence of documentation of the complaints against him. (Doc. No. 34-10, at 6.) She asked whether there was any additional documentation that she was missing and noted, "If he has no previous documentation [then] we may want to revisit on how we moved forward and consider bringing him back on board." (*Id.*)

Stofer had a conversation with Hector Aponte, and she summarized his report to her as follows:

> There were multiple guest complaints, [team member ("TM")] complaints and the TMs stated that he was creating a very toxic environment so much so that they had to pull training from the restaurant. They met [Kean] when they took over Nashville and you could tell off the bat – not in line with our culture and guest counts. He did not seem that way at all. [Kean] had reported to Tom [Mallendine], and they were really close. A main reason [Mallendine] was let go for not holding GM's accountable. [Kean] was left to run things however he wanted. He had some TMs that were his favorite and if you weren't that, it was going to be a hard time for you. [Gilbert] had worked with him a few times and that's the environment he would create. When they talked next steps and taking on the new region/team that it was best to move to termination. It wasn't just one issue they could have coached, it was MULTIPLE issues.
>
> They need to start putting in players that they know can deliver and fit into the culture. Doug, Dom, and Wyman were with them when they made the visit. They even said we need to move on from players that do not fit in our culture. At some point, we need to just get players in there that will be dedicated and good leaders for us. That's how they came upon that decision. It's really no different than how they have moved forward with other managers in their region either. His age had nothing to do with his decision what-so-ever. [Gilbert] is a new DO that is older

---

[22] There is no evidence in the record regarding when, exactly, Kean would have been in a position to "question" decisions made by Gilbert after her promotion to DO and prior to Kean's termination.

than [Kean] and a female, no discrimination whatsoever. It was all for performance and multiple concerns at that. This was carried out very professionally. When [Aponte] met [Kean], he gave him his business card and they have emailed back and forth several times.

They would have done a performance plan or by when if it was an issue like a piece of performance or something they could have coached and anticipated changing but based on the brand standards and how we want our restaurants to operate, these were considered critical and they did not find this to be a good fit for this company at all. It truly was toxic there.

Example: After the termination, [Kean] told [Gilbert] "I don't know how you got this position but I doubt you will be able to keep it" – that was standard for how he spoke to people. He had a tendency to bash or talk ill to people. That's the environment he was creating there. Also, some AA TMs felt that they were treated differently because of the color of their skin. They spoke to [Kean] before they offered [Gilbert] a position – they flew out as soon as they took over the region – and you can tell by body language, and the way he would answer questions, they were just off-putting. They could tell exactly what was going on in that restaurant right when they walked in.

(Doc. No. 34-10, at 5.) The plaintiff disputes the substance of these allegations.

Stofer spoke with some of the other team members and reached out to a few other individuals with knowledge of the plaintiff's past conduct, including Jason Mansfield, and she uncovered some communications about Kean dating from 2015. (Doc. No. 34-10, at 4.) Ultimately, she reported back to Kean that the termination decision would be upheld, in response to which the plaintiff stated that he would be contacting an attorney. (*Id.*)

After Kean's termination, his "second in command," Eric Bean, replaced him as GM of Chili's Murfreesboro. Bean was born in 1985 and was 33 years old at the time of his promotion to GM.

The plaintiff testified about the purportedly ageist environment he endured while employed by the defendants. Specifically, he believed that he was the oldest GM, just from looking at the others, and the other GMs and his supervisor called him "Old Man," and "Old Fart." (Kean Dep. 35.) His former DO, Rocky Hill, always called him "Old Man." However, Hill was the same person

who persuaded Kean to apply to work for the defendants when he was 51 years old, and Hill left employment with the defendants in 2014. Kean never reported Hill's comments to anyone. As for the individuals who referred to him as "Old Fart," Kean described some of them as "older," though not as old as he. (Kean Dep. 98.) He was not "touchy" about things like that, and he considered the moniker "playful" but "improper." (*Id.* at 99.) The other GMs were all 10 to 20 years younger than he was. (*Id.* at 98–99.) Although Kean never reported these comments to upper management, he also stated that that they occurred during meetings when supervisors were around and "may have overheard" them. (*Id.* at 99.)

In addition, Jason Mansfield, then a PeopleWorks Partner for the plaintiff's region, told the plaintiff sometime in the 2013/2014 timeframe that his (Kean's) management style was "old school" and that his "old school methods of management would no longer work with the younger group of employees the defendants were hiring." (No. 1 ¶ 15.; Kean Dep. 37, 40.) Kean interpreted this comment to mean that he was "too old to manage the younger people. They wouldn't accept my management style as well," but he did not actually ask Mansfield what he meant. (Kean Dep. 39.) When Allen Pitts was the plaintiff's supervisor in 2016/2017, he referenced Mansfield's talking about Kean's "old-school management style." (Kean Dep. 41.) Kean also stated that he had a "pretty good relationship" with Pitts and probably would have asked him why he was bringing that up. (*Id.* at 42.) Pitts was over the age of 40 during the period that he was Kean's DO. Kean concedes that Pitts had nothing to do with the decision to terminate him.

Kissel did not have regular dealings with Mansfield during the period that Kissel was the VPO who supervised Gilbert and approved Kean's termination. (Kissel Dep. 67.) The PeopleWorks Partner with whom he regularly dealt in the Nashville market—and the one involved in Kean's termination—was Hector Aponte. (*Id.*; *see generally* Doc. No. 34-10.)

The plaintiff purports to dispute this assertion, but the only evidence to which he points is the TMR Report, which documents that *after* the plaintiff had been terminated but while Stofer was still doing some investigating to determine whether she would recommend rescinding the termination, Stofer spoke with Jason Mansfield, who told her that he remembered that, when he was Kean's DO and Kean was his GM, "there were multiple TMR complaints that would come in." (Doc. No. 34-10, at 4.) When he was Kean's PeopleWorks Partner, "there were other allegations brought forward that they did document." (*Id.*) Mansfield told Stofer that there was documentation of issues with interpersonal skills and "validation that [Kean] was discriminatory" and that Mansfield would "search for the documentation and send it over." (*Id.*)[23] After receiving this communication, Stofer notified Kean that TMR would "support and uphold" the termination decision by "higher management." (*Id.*)

The plaintiff admits, for purposes of the defendants' motion, that all complaints of harassment and discrimination are investigated and responded to by the defendants' PeopleWorks Department. He was well aware of how to make a claim to PeopleWorks.

Gilbert terminated one other manager, Mario Martinez, in January 2019, based on employee complaints—specifically complaints of sexual harassment and "inappropriate comments and conversation." (Doc. No. 48-19.) Martinez was 33 years old.[24]

---

[23] Mansfield subsequently forwarded to Stofer a 2015 email exchange among Mansfield, Allen Pitts, and two other individuals concerning Kean that referenced a "final document" (Doc. No. 34-10, at 4), but the TMR Report does not include any document that might have been attached to the original emails. If such documentation has been produced in this case, it has not been brought to the court's attention.

[24] Gilbert resigned from her employment with the defendants in September 2019. (Gilbert Dep. 26.) The plaintiff contends that whether Gilbert resigned or was terminated is a disputed fact. Even if it were disputed, this fact is not material.

Kean filed a Charge of Discrimination with the EEOC in March 2019. The EEOC issued a Notice of Determination and Right to Sue in June 2022. He filed this lawsuit in November 2022, asserting that he was terminated because of his age, in violation of the ADEA.

2. *Legal Framework*

Under the ADEA, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may prove an ADEA violation using direct or indirect evidence of discrimination but, "[n]o matter the type of evidence presented, the plaintiff retains the burden of persuasion to demonstrate 'by a preponderance of the evidence . . . that age was the "but-for" cause of the challenged employer decision.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).[25] In other words, "it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020) (quoting *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 529 (6th Cir. 2014)).

Claims relying on indirect evidence of discrimination in violation of the ADEA are evaluated under the "well-established *McDonnell Douglas* burden-shifting framework." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).The first step under this framework requires the plaintiff to establish a *prima facie* case of discrimination. If he succeeds at that step, the burden shifts to the defendant to "produce legitimate, nondiscriminatory reasons for the adverse employment action." *Id.* If the employer can produce such reasons, the burden then shifts

---

[25] The Sixth Circuit has noted that this "but-for" standard applies only to claims for backpay and compensatory damages under the ADEA, while a claimant seeking injunctive relief need only show that "age discrimination play[ed] any part" in the decision to demote him. *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 578 n.2 (6th Cir. 2022) (quoting *Babb v. Wilkie*, 589 U.S. 399, 406, 409 (2020)).

back to the plaintiff "to establish that the proffered reasons are simply pretext for age discrimination." *Id.* Generally, "[i]f the plaintiff satisfies this third step, the factfinder may reasonably infer discrimination." *Id.* (citing *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 349 (6th Cir. 2015)).

To establish a *prima facie* case of age discrimination, a plaintiff must show: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 578 (6th Cir. 2022) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012)). As relevant here, such circumstances include "when the employer replaced the plaintiff with a [significantly] younger employee" or "treated similarly situated, non-protected employees more favorably." *Willard*, 952 F.3d at 808 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008))

To rebut a defendant's proffered reason for its action, the plaintiff must offer "'evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.'" *Willard*, 952 F.3d at 807 (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)).

　　　　3.　　*Analysis*

　　　　　　a)　　*Kean's Prima Facie Case*

The defendant makes no real attempt to argue that the plaintiff fails to establish a *prima facie* case of age discrimination. Indeed, the record is clear that Kean was over age 40 when he was terminated, that he was well qualified for his position, and that he was replaced by Bean, who was substantially younger.

The defendants nonetheless contend that, because the record establishes that Gilbert and Kissel did not know the plaintiff's age when he was terminated, "it is impossible for them to have

decided to take action against Kean 'because of' his age." (Doc. No. 43, at 11.) They assert that the decisionmakers' lack of knowledge of his age "precludes Kean from being able to state a *prima facie* case of age discrimination," thus entitling them to summary judgment. *Id.*

The record does establish, however, that Gilbert and Kissel had met the plaintiff prior to terminating him, even if they had not scrutinized his personnel file. Gilbert spent a substantial amount of time with him at regularly scheduled meetings when they were both GMs within the same geographic region. While neither she nor Kissel may have known the plaintiff's exact date of birth or age, they would have been qualified to guess his approximate age just from seeing him and surely would have known that he was older than 40 and thus a member of a protected class under the ADEA.[26]

The Sixth Circuit has repeatedly emphasized that the plaintiff's "burden to establish a prima facie case is light, one 'easily met' and 'not onerous.'" *Willard*, 952 F.3d at 808 (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011), and *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)). The court finds that the plaintiff has presented sufficient evidence to establish the fourth factor of his *prima facie* case simply by pointing to evidence that the decisionmakers had met and interacted with him prior to the termination, putting

---

[26] The defendants do not cite any binding caselaw on point for the proposition that the defendant's knowledge of a plaintiff's age is necessarily part of the plaintiff's *prima facie* case under the ADEA. The Sixth Circuit has held, in the context of a Title VII case premised on pregnancy discrimination, that the plaintiff had to prove that her employer had actual knowledge of her pregnancy at the time it made the decision to terminate her in order to establish the fourth element of her *prima facie* case—"a nexus between her pregnancy and the decision to discharge her." *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 443 (6th Cir. 2002). As the court also noted, however, "[u]nlike race and gender, early pregnancy is not an obvious condition." *Id.* But, as a matter of common sense, advanced middle age, like race and gender, is typically a rather obvious condition. Likewise, one meeting with Bean, then in his early 30s, likely would have been sufficient to permit Gilbert to verify that he was significantly younger than the plaintiff.

them in a position to know his approximate age, and that they replaced him with a substantially younger employee.

b)     *The Proffered Reason for the Plaintiff's Termination*

The defendants maintain that the decision to terminate the plaintiff was "because of his restaurant's culture, as evidenced by the complaints [they] received." (Doc. No. 43, at 12.) They assert that Gilbert "experienced Kean's toxicity firsthand" when he called her back after she notified him that she was discontinuing his restaurant as a training center, only to "berate her for calling him on his day off," and again when he made "the snide comment that he did not know who promoted her or why she was promoted, but she was 'not going to last very long.'" (Doc. No. 43, at 11.) As the defendants point out, it is undisputed that "culture" was important to Chili's, and the emails that make up the TMR Report show that Kean's supervisors perceived him as creating a toxic environment at the restaurant he supervised. Gilbert's email to PeopleWorks formalizing the termination request identified "Unsatisfactory Job Performance" as the reason for the termination, with the comment, "was terminated due to culture in the restaurant." (Doc. No. 34-17.)

A legitimate, non-discriminatory reason is one that, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993). The Sixth Circuit has repeatedly held that "violations of company policies, poor managerial skills, or leadership failures are legitimate, non-discriminatory reasons for disciplining or discharging an employee." *Howley v. Fed. Express Corp.*, 682 F. App'x 439, 446 (6th Cir. 2017). The creation of a "culture" incompatible with the company's goals and expectations is a legitimate, non-discriminatory reason for termination.

The plaintiff contends that the defendants cannot meet their burden of production except through the introduction of the TMR Report which, as discussed above, the plaintiff maintains

should be excluded from evidence as a sanction for the defendants' having destroyed the original emails relating to his termination. The court declines to exclude the TMR Report and finds that, despite the relevant decisionmakers' inability to recall the plaintiff's termination or their role in it, this document is admissible and permits the defendants to carry their burden of articulating a legitimate, non-discriminatory reason for the plaintiff's termination.

c)      Pretext

"To survive summary judgment, a plaintiff need only produce enough evidence to support a *prima facie* case and to rebut, but not to disprove, the defendant's proffered rationale." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014). He can do this by producing evidence from which a jury could conclude that "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not *actually* motivate [his discharge], or (3) that they were *insufficient* to motivate discharge." *Blizzard*, 698 F.3d at 285 (6th Cir. 2012) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)) (emphasis in original). This test "need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Regardless . . . , the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Alberty v. Columbus Twp.*, 730 F. App'x 352, 361 (6th Cir. 2018) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)).

The defendants argue that the plaintiff cannot show that the proffered reason for his termination was pretext, as his "entire argument that his termination was unlawful appears to be based on his unfounded view that he was performing well, based on the data reflected in his [KPI] reports and [MEE] surveys." (Doc. No. 43, at 12.) The defendants insist, however, that those

markers of the plaintiff's performance are irrelevant, because they were not considered by the decisionmakers, who instead relied on their "subjective assessment of the culture Kean had created in the restaurant, which is not reflected on these documents." (*Id.*)[27] They insist that the subjective basis for their decision does not make it pretextual. They also argue that the plaintiff's (and Mallendine's and Bean's) disagreement with the decisionmakers' assessment is not evidence of pretext.

The defendants also point out that Kean himself testified that he believed that Gilbert was "threatened" by him and wanted to hire someone with less experience who would not question her judgment. They argue that this reason, even if true, would not be unlawful. *See, e.g.*, *Allen v. Diebold, Inc.*, 33 F.3d 674, 676 (6th Cir. 1994) (holding that "the ADEA prohibits only actions actually motivated by age and does not constrain an employer who acts on the basis of other factors—pension status, seniority, wage rate—that are empirically correlated with age" (citation omitted)).

The plaintiff, for his part, asserts that the only specific complaints enunciated by the defendants relate to the complaints by Melissa Stonestreet and Rondale Brown. As for Stonestreet, Gilbert has only the vaguest recollection that she had complained but did not report it to PeopleWorks, did not talk to Kean or anyone on his team to verify whether Stonestreet's complaints were justified, and cannot rebut Kean's and Bean's testimony to the effect that

---

[27] While arguing that these documents were irrelevant because Gilbert, Kissel, and Aponte never considered them, the defendants also assert that they are not accurate, because they predate by several months the plaintiff's termination and so do not necessarily reflect the culture at his restaurant at the time of his termination. They maintain that the MEE surveys from 2019, after Kean's termination, "paint a much more accurate picture," as they contain references to Kean's toxicity and indicate improvement in the "culture" following Kean's termination. The court finds that these surveys are of virtually no relevance. While they might retroactively justify the decision, they did not contribute to it.

Stonestreet was an unsatisfactory and lazy MID. Regarding Rondale Brown, the plaintiff takes issue with the defendants' decision to uphold Brown's termination after speaking with both Brown and the plaintiff while nonetheless crediting Brown's allegations of discrimination. He points out that the defendants have not provided any level of detail regarding other complaints. Kean argues that the alleged complaints about culture had no basis in fact, were not sufficient to motivate his termination, and did not actually motivate the decision.

As for basis in fact, however, the plaintiff does not actually dispute that both Stonestreet and Brown complained about him. (Pl.'s Resp. SUF, Doc. No. 49 ¶¶ 34, 38–39.) And, as the defendants point out, the fact that both Stonestreet and Brown were (in the plaintiff's view) unsatisfactory employees would not necessarily make their complaints about Kean's treatment of them invalid.

The plaintiff also asserts that the proffered reason was insufficient to motivate the employment decision. With regard to this question, it is undisputed that Gilbert notified Kean that his restaurant would be discontinued as a training center based on a TMR Report and that she would "look at recertifying the restaurant later." (Kean Dep. 58.) He called her back to tell her it was unprofessional of her to make that call to him on his day off and that he did not want to do training anymore anyway. (*Id.* at 59–60.)

From there, the evidence regarding the thought process behind the termination decision is almost entirely laid out in the TMR Report. This shows that Gilbert reported to TMR on November 17, 2018 that she had received a call from Rondale Brown, complaining that his termination by Kean the day before was unjustified. Kristin Stofer spoke with Brown and reported back in an email to Gilbert and Rich Kissel dated November 19, 2018 that, according to Brown, the environment at the Chili's Murfreesboro was "tense and stressful for the TMs" when Kean was

there, that Kean picked on him and treated him unfairly, and another "TM informed him that the GM was being racist towards him." (Doc. No. 34-10, at 8.) Stofer noted in the same email that they had "received concerns on [Kean] in the past for a hostile work environment that we were not able to substantiate," aside from a "documented results pyramid conversation with him in September." (*Id.*) Although the plaintiff disputes the validity of the complaints, he has not presented any basis for concluding that the complaints were insufficient to motivate his termination.

Finally, the plaintiff also contends that the proffered reasons did not *actually* motivate his termination. He acknowledges that, to establish pretext based on this method, he must "admit[] the factual basis underlying the discharge and acknowledge[] that such conduct could motivate the dismissal but attack[] the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Here, he argues that anyone conducting an "honest and holistic view" of his performance would have had to see that he was "succeeding in terms of culture on all levels," but the defendants simply ignored the existing evidence suggesting that the two complaints were without any basis. (Doc. No. 48, at 15.) And they did so, he complains, because they were "motivated by other reasons." (*Id.*)

In support of this assertion, he points to his own allegations that he had been repeatedly subjected to age-related derogatory comments by other GMs at meetings at which his supervisors were present, that Gilbert herself met him at those meetings, and that Jason Mansfield, the DO who accused him of having an "old-school management style" was involved in the ultimate decision to terminate his employment. He claims that the "Defendants' own handbook [shows]

that Plaintiff was not the age class of store employees that it wanted to attract a younger clientele." (*Id.* at 16.)

The plaintiff's perception of the defendants' employee Handbook as establishing that it sought younger employees to attract to a younger clientele is his subjective view only. The passages he cites establish only that the company wanted to attract new clientele and bring back prior clients who had moved on as well, whatever their age. (*See* Doc. No. 48-8, at 4 ("[W]e've put a plan in place to reimagine our brand for the next 40 years. Our destiny depends on whether we can all pull together and create an experience our Guests can't find anywhere else. We need a whole new generation (those darn Millennials!) to start dating us and fall in love. And, we need to bring back the folks that divorced us after the boredom of marriage got too tough to handle.").) No reasonable juror would consider the handbook as evidence that the defendants were motivated to fire the plaintiff because of his age.

And nothing in the record suggests that the decision to terminate the plaintiff was based on anything other than a perception that he was not fostering the desired culture. As set forth in the TMR Report, once Stofer reported Brown's complaint, Gilbert reached out to Hector Aponte to ask if he would "help [her] with this." (*Id.*) Following a telephone conversation between Aponte and Gilbert, Gilbert emailed Rich Kissel, copying Aponte and Stofer, to notify him that she and Aponte were in agreement that they needed to "move forward with the term on Jeff," due to "guest and team member complaints, as well as, the MID training concerns." (*Id.* at 7.) If this recommendation was approved, she further proposed to go ahead with it and to promote Eric Bean to GM in that restaurant. She asked Kissel to "please advise whether we can proceed with this." (*Id.*)

Stofer responded that she had located the termination paperwork for Rondale Brown from Kean and that they needed to discuss that further. She also noted her concerns about terminating Kean when there was effectively no documentation of concerns about his performance. (*Id.*) She later reported that she had spoken with Kean regarding Brown. She documented his explanation for the termination of Brown and expressed her support for upholding his decision. When she inquired as to what the "team" had decided, Aponte responded that they were "aligned to term Jeff Kean." (*Id.* at 7.) The termination apparently took place on November 27, 2018. After Kean complained, Stofer conducted some additional investigation, which unearthed some older complaints, before ultimately deciding that she would not recommend rescinding the termination.

Based on this record, the court has no hesitation in finding that Kean's termination was unfair and poorly documented and that the defendants failed to document complaints against him or to adequately communicate those complaints to Kean. Kean disputes whether some of these complaints actually existed and points out that he received nothing but positive performance evaluations and regular salary increases and bonuses in the years just prior to his termination. What is lacking, however, is any suggestion that the defendants invented cause for termination or that their—albeit subjective and perhaps unwarranted—concerns about the environment Kean was creating at his restaurant were completely unjustified. More to the point, there is absolutely no evidence suggesting that the termination was because of Kean's age.

Again, the only evidence to which Kean points in support of his assertion that a reasonable jury could infer that age was the cause are his allegations that other managers called him names like "Old Fart" and "Old Man" at company meetings and that Jason Mansfield accused him in approximately 2013 or 2014 of having an "old-school" management style. According to the plaintiff, Mansfield must have repeated this criticism to Allen Pitts, who mentioned it to the

plaintiff in 2016 or 2017. (Kean Dep. 41–43.) Pitts was indisputably not involved in the decision to terminate the plaintiff. While Mansfield's reference to Kean's "old-school" style of management" might constitute indirect evidence of age discrimination,[28] the comment was made many years before the plaintiff's termination. There is no evidence that Gilbert, Kissel, or Stofer knew about that comment (or about other GMs' calling the plaintiff "Old Fart"). There is also no evidence that Mansfield had anything more than minor input in Stofer's decision to uphold Gilbert's termination decision.

The court finds, in sum, that the plaintiff cannot establish that the proffered reason for his termination was pretext. More to the point, he cannot establish that it was pretext for discrimination. Even if a jury could doubt the veracity of the proffered explanation, the plaintiff himself surmises that Gilbert simply did not like him and did not want to supervise a GM as experienced and knowledgeable—and willing to challenge her—as he was. These are not proxies for discrimination based on age.[29] And the question before the court in "deciding an employer's motion for summary judgment is whether the evidence, taken as a whole and in the light most favorable to plaintiff, is sufficient to permit a rational trier of fact to conclude 'that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d

---

[28] *See DeBarr v. Cleveland Clinic Found.*, 918 F. Supp. 2d 676, 684 (N.D. Ohio 2013) (finding co-workers' references to the plaintiff as "old school" were "insufficient to establish direct evidence as they are not made by decision makers and require a fact finder to draw inferences"); *see also Gilster v. Humana, Inc.*, No. 1:14-CV-961, 2016 WL 223582, at *5 (S.D. Ohio Jan. 19, 2016) ("Since 'old school' is not a direct reference to age, a factfinder would have to infer that [the plaintiff's supervisor] was referring to Plaintiff's age when he said Plaintiff is 'old school.'").

[29] The plaintiff himself acknowledges that, "[i]n the fall of 2018," shortly before his termination, "the Nashville region underwent a transition in terms of upper-level management. The VPO over the entire region was let go, as was Mr. Mallendine. The VPO was replaced by Rich Kissel, an existing VPO in the Florida region. Mr. Mallendine was replaced by Marsha Gilbert." (Doc. No. 40, at 1–2.) Under these circumstances, it is entirely plausible that Gilbert wanted to put her own GMs in place and to remove those who had been close to her predecessor. It is not plausible that age was a motivating factor, much less the but-for cause for her decision.

523, 532 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009)). In the case presented here, no rational jury could conclude that the plaintiff's termination was based on his age.

The defendant is entitled to summary judgment.

### C. The Plaintiff's Motion for Summary Judgment

Because the court will grant the defendants' Motion for Summary Judgment, the court has no need to consider the plaintiff's and will deny it as moot. The court notes, however, that the sole basis for the plaintiff's motion is that the defendants have failed to offer a plausible non-discriminatory reason for his termination, offering instead only "a generic reference to the possibility of receiving complaints or 'culture,'" as the result of which judgment should be entered in his favor. His theory is premised upon the acting decisionmakers' lack of recall of the events and his contention that the TMR Report should be excluded. As discussed above, however, the court will not exclude the TMR Report and finds that the defendants have proffered a legitimate, non-discriminatory explanation—one that has not shifted over time—for the plaintiff's termination.

## III. CONCLUSION

For the reasons set forth herein, the plaintiff's Motion for Sanctions will be granted in part and denied in part, and the defendants will be ordered to pay the costs and attorney's fees incurred by the plaintiff in connection with filing that motion. Notwithstanding, the court will deny the plaintiff's Motion for Summary Judgment (Doc. No. 39) and grant the defendants' (Doc. No. 42). An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge